IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 13-cv-00597-PAB

JOHN N. GIBSON,

       Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

       Defendant.

---

## ORDER

---

This matter is before the Court on plaintiff John N. Gibson's complaint [Docket No. 1], filed on March 7, 2013. Plaintiff seeks review of the final decision of defendant Carolyn W. Colvin (the "Commissioner") denying plaintiff's claim for supplemental security income under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-33 and 1381-83c.[1] The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 405(g).

## I. BACKGROUND

On July 23, 2010, plaintiff applied for disability benefits under Title XVI of the Act, claiming that he suffered from depression, seizures, asthma, stroke, post-traumatic stress disorder, bipolar disorder, and sleep apnea. R. at 79. Plaintiff alleged that he had been disabled since April 16, 2010. *Id.* at 12. After an initial administrative denial

---

[1]The Court has determined that it can resolve the issues presented in this matter without the need for oral argument.

of his claim, plaintiff appeared at a hearing before an Administrative Law Judge ("ALJ") on December 6, 2011. *Id.* On December 13, 2011, the ALJ issued a decision denying plaintiff's claim. *Id.* at 23.

The ALJ found that plaintiff had the severe impairments of hypertension, obesity, and depression. R. at 14. The ALJ found that these impairments, alone or in combination, did not meet one of the regulations' listed impairments, *id.* at 16, and ruled that plaintiff had the residual functional capacity ("RFC") to "perform a full range of work at all exertional levels, but with the following non-exertional limitations: such work does not require exposure to unprotected heights or hazardous machinery, and involves a Specific Vocational Preparation (SVP) level of less than or equal to 3, with a GED level not requiring more than basic reading or math skills." *Id.* at 17.

The Appeals Council denied plaintiff's request for review of this denial. R. at 1. Consequently, the ALJ's decision is the final decision of the Commissioner.

## II. ANALYSIS

### A.  Standard of Review

Review of the Commissioner's finding that a claimant is not disabled is limited to determining whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *See Angel v. Barnhart*, 329 F.3d 1208, 1209 (10th Cir. 2003). The district court may not reverse an ALJ simply because the court may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in her decision. *See Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir.

1990). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). Moreover, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The district court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty*, 515 F.3d at 1070. Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

## B. The Five-Step Evaluation Process

To qualify for disability benefits, a claimant must have a medically determinable physical or mental impairment expected to result in death or last for a continuous period of twelve months that prevents the claimant from performing any substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(1)-(2). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A) (2006). The Commissioner has established a five-step sequential evaluation process to determine whether a claimant is disabled. 20 C.F.R.

3

§ 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). The steps of the evaluation are:

> (1) whether the claimant is currently working; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets an impairment listed in appendix 1 of the relevant regulation; (4) whether the impairment precludes the claimant from doing his past relevant work; and (5) whether the impairment precludes the claimant from doing any work.

*Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (citing 20 C.F.R. § 404.1520(b)-(f)). A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health and Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

The claimant has the initial burden of establishing a case of disability. However, "[i]f the claimant is not considered disabled at step three, but has satisfied her burden of establishing a prima facie case of disability under steps one, two, and four, the burden shifts to the Commissioner to show the claimant has the residual functional capacity (RFC) to perform other work in the national economy in view of her age, education, and work experience." *See Fischer-Ross v. Barnhart,* 431 F.3d 729, 731 (10th Cir. 2005); *see also Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5 (1987). While the claimant has the initial burden of proving a disability, "the ALJ has a basic duty of inquiry, to inform himself about facts relevant to his decision and to learn the claimant's own version of those facts." *Hill v. Sullivan,* 924 F.2d 972, 974 (10th Cir. 1991).

### C.  The ALJ's Decision

Plaintiff argues the ALJ erred by (1) failing to consider Dr. Marten's assessment of plaintiff's limitations in attention and concentration when determining plaintiff's RFC,

Docket No. 17 at 6-7, and (2) finding that plaintiff's impairments were the result of non-compliance with medication without considering plaintiff's reasons for discontinuing his medication. *Id.* at 8-9.

The relevant evidence of record is as follows. In April, 2010, plaintiff was taken to the emergency room complaining of headaches. R. at 277. The emergency room treaters performed blood work and a CT scan, and ordered a neurological consultation. *Id.* at 278. Plaintiff reported at that time that he was taking metoprolol for his hypertension, but that he had not taken the medication for the past two days because he forgot. *Id.* at 277. At the emergency room, plaintiff was given Norvasc and Lopressor and his "[b]lood pressures came down nicely." *Id.* at 275. Plaintiff's consulting neurologist found that he had "no neurologic deficits," but that the CT scan of his brain showed a "possible 12 mm left upper convexity intracerebral hemorrhage." *Id.* at 273. The neurologist opined that plaintiff's intracerebral hemorrhage was likely caused by his hypertension. *Id.* at 274.

Plaintiff began seeing his primary care physician, Dr. Mihir Patel, on April 22, 2010. R. at 252. At that visit, plaintiff reported to Dr. Patel that he had been taking his medications as prescribed, but that he experienced side effects of dizziness and drowsiness as a result. *Id.* at 253. At a follow-up visit with Dr. Patel on July 24, 2010, plaintiff reported that he had discontinued taking Lamictal[2] because it made him feel

---

[2]Lamictal, generic name Lamotrigine, is a prescription drug that is "used alone or with other medications to treat seizures in people who have epilepsy or Lennox-Gastaut syndrome (a disorder that causes seizures and often causes developmental delays). Nat'l Inst. of Health, Medline Plus Lamotrigine, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695007.html.

bad. *Id.* at 250.  Dr. Patel "strongly advised" plaintiff to resume taking Lamictal and made a note to refer him to a neurologist. *Id.*

On July 20, 2010, plaintiff informed Dr. Patel that he had stopped taking Lamictal due to the side effects and wanted to discuss alternatives.  R. at 244.  Plaintiff told Dr. Patel that he suffered from seizures one to two times per month, but that he believed the Lamictal was inducing his seizures rather than helping to treat them. *Id.*  Dr. Marten prescribed Dilantin as an alternative to Lamictal.[3] *Id.* at 245.

On September 6, 2010, plaintiff was taken to the emergency room because his mother was concerned he had suffered a stroke.  R. at 260.  According to the emergency department report, plaintiff "seem[ed] to have a little issue with short-term memory formation, but it is not consistent.  It is not every time you talk about something with him." *Id.* at 261.  Plaintiff's emergency room treaters determined that he had not had a stroke and recommended he be monitored on an outpatient basis. *Id.* at 262.  As of plaintiff's September 6, 2010 emergency room visit, his "Dilantin level was zero, so he [was] not taking it at all." *Id.* at 261.

Plaintiff appeared in the emergency room again on September 16, 2010, complaining that he had been suffering intermittent headaches for the previous three days.  R. at 267.  A CT scan showed stable findings without any change from previous visits. *Id.* at 268.  Plaintiff reported that while he "is supposed to be taking Dilantin," he "does not like to take it so he has not taken it in several days." *Id.* at 267.  Plaintiff was

---

[3]Dilantin, generic name Phenytoin, is a prescription medication used to control certain types of seizures.  Nat'l Inst. of Health, Medline Plus Phenytoin*, available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682022.html.

informed that "he needed to be compliant with his medications because uncontrolled seizures are life-threatening, if not significantly detrimental." *Id.* at 268.  Plaintiff informed emergency room doctors that he continued to drive, *id.* at 267, and was informed that "he absolutely must not drive." *Id.* at 268.

On October 11, 2010, Brad Marten, Psy.D., performed a psychological evaluation of plaintiff.  Dr. Marten assessed plaintiff's mental capacity and determined that plaintiff lacked basic math skills, based on an inability to count backwards from 100 by intervals of seven and inability to perform basic subtraction.  R. at 290.  Dr. Marten also tested plaintiff's short-term memory, finding that plaintiff was able to recall three words–house, lion, and china–when asked to repeat them immediately after hearing them, but was unable to do so five minutes later. *Id.* at 291.  Plaintiff was unable to spell "world" backwards and initially faltered when asked to spell the word "cat" backwards, but corrected himself. *Id.* at 292.  Dr. Marten noted that it was "very unusual for a claimant not to be able to spell the word cat backwards easily and immediately except in the cases of more severe neurological impairment." *Id.*  Dr. Martin diagnosed plaintiff with mathematics and reading disorders, *id.*, but noted on two occasions in his report that it was "not certain [plaintiff] provided his best effort" in responding to questions. *Id.* at 292, 293.  Dr. Marten also diagnosed plaintiff with "major depressive disorder, recurrent, mild" and post-traumatic stress disorder. *Id*. at 292.

With respect to plaintiff's ability to work, Dr. Marten noted that plaintiff's "apparent limited basic math skills may . . . interfere with his capacity to carry out work-

7

related tasks and functions requiring such skills." R. at 293. Noting the "slow pace and hesitant response" to the mental status inquiry, Dr. Marten also opined that plaintiff "may experience difficulty in his capacity to carry out work related tasks and function with expected rates of speed and efficiency." *Id.* Finally, Dr. Marten opined that plaintiff's history of "severe recurrent clinical depression" and post-traumatic stress disorder "may also negatively impact interpersonal functioning in the work place settings." *Id.*

In October 2010, Dr. Arthur Lewy reviewed the record, including plaintiff's testimony and Dr. Marten's findings. R. at 78-82. Dr. Lewy concluded that plaintiff can "follow simple 1 and 2 step instructions and concentrate for up to 2 hours at a time," can "occasionally work with supervisors, co-workers, and interact with [the] general public," and "can complete predictable tasks and cope with usual hassles, stersses [sic] and changes." *Id.* at 89-90.

### 1. The ALJ's RFC Determination

Plaintiff argues that the ALJ did not consider portions of Dr. Marten's opinion, even though the ALJ gave that opinion "great weight." Docket No. 17 at 6. Specifically, plaintiff argues that the ALJ's determination that plaintiff is capable of performing work with an SVP of three or less is inconsistent with Dr. Marten's finding that plaintiff's attention and concentration are limited, *id.*, and that the ALJ therefore ignored Dr. Marten's conclusions regarding plaintiff's attention and concentration. *Id.* at 7.

The Court disagrees with plaintiff. The ALJ did not ignore Dr. Marten's conclusions concerning plaintiff's attention and concentration. The ALJ in fact

specifically discussed those conclusions in determining plaintiff's RFC.  R. at 20.  The ALJ noted Dr. Marten's conclusion that plaintiff "had deficits in concentration, persistence, and pace" and also that Dr. Marten found an "issue of substandard effort." *Id.*  The ALJ then specifically credited Dr. Marten's assessment of plaintiff's ability to concentrate in finding that plaintiff is limited to a SVP level of less than or equal to 3.  *Id.* While plaintiff may believe that the RFC determination is inconsistent with Dr. Marten's conclusions, "the ALJ, not a [doctor], is charged with determining a claimant's RFC from the medical record."  *Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004).

### 2. Plaintiff's noncompliance with treatment

Plaintiff next argues that the ALJ erred by finding that plaintiff's impairments were the result of noncompliance with treatment without first considering plaintiff's reasons for not taking his prescribed medication.  Docket no. 17 at 8.   An ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."  SSR 96-7p, 1996 WL 374186 at *7 (July 2, 1996).  The ALJ is, however, free to consider evidence that a claimant did not follow prescribed treatment in assessing the claimant's credibility.

"Before relying on . . . a failure to pursue treatment . . ., the ALJ should consider (1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4)

whether the refusal was *without justifiable excuse*." *Ragland v. Shalala*, 992 F.2d 1056, 1060 (10th Cir. 1993) (emphasis added).  One justifiable excuse noted in the regulations for failing to take prescription medication is that "the side effects are less tolerable than the symptoms."  SSR 96-7p, 1996 WL 374186 at *8.

Here, the ALJ relied on plaintiff's failure to take hypertension medications as evidence that plaintiff's symptoms were "the result of pervasive non-compliance issues." R. at 18.  The Court finds that the ALJ erred in not specifically inquiring into whether plaintiff had a justifiable excuse for not taking his hypertension medication.  SSR 96-7p, 1996 WL 374186 at *7.  The Court finds, however, that this error was harmless.  In the administrative context, harmless error analysis is appropriate "where, based on material the ALJ did at least consider (just not properly), a [reviewing court can] confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way."  *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004).  The ALJ did not ask plaintiff about his failure to take his prescribed hypertension medication, but plaintiff testified at the hearing that he had taken the medications regularly since April 2010 and that they did not help control his blood pressure.  R. at 38.  Additionally, plaintiff at various points reported to his treaters that his hypertension medication made him "sleepy," *id.* at 201, caused "dizzyness" and "drowsiness," *id.* at 253, and that he stopped taking it because of the side effects.  *Id.* at 309.  The Court finds that no reasonable factfinder who had considered plaintiff's rationale for not taking his hypertension medication would have found it to be a justifiable excuse, *Ragland*, 992 F.2d at 1060, or that the side effects were "less tolerable than the symptoms."  SSR 96-7p, 1996 WL 374186 at *8.  The record shows

that plaintiff's treaters believed that his hypertension was the cause of plaintiff's stroke, R. at 260, and that plaintiff was advised that if he did not get his hypertension under control, he was likely to suffer another stroke. *Id.* at 319. Plaintiff's treater noted that plaintiff's hypertension was likely to cause headaches, nausea, tremors, and visual disturbances. *Id.* at 299. When plaintiff presented to the emergency room complaining of a headache, blurred vision, and lightheadedness, giving him hypertension medication caused those symptoms to quickly abate. *Id.* at 275. In light of the effects of plaintiff's hypertension, no reasonable factfinder could conclude that plaintiff's complaints of dizziness and drowsiness constituted a justifiable excuse for his failure to follow prescribed treatment. This is particularly true where, as here, plaintiff reported the same side effect as a result of his anti-seizure medication. R. at 312 (noting plaintiff's report that Dilantin made him "sleepy" the next day).

Plaintiff also argues that the ALJ erred in discounting plaintiff's justification for not taking his anti-seizure medication. Docket No. 17 at 8-9. The ALJ, however, did not rely on plaintiff's non-compliance with anti-seizure medication for her finding that plaintiff was not disabled. The only discussion of plaintiff's failure to take seizure medication in the ALJ's decision was with respect to the credibility of plaintiff's testimony that he was compliant with his anti-seizure medication. R. at 20. The ALJ is permitted to consider non-compliance with prescribed medications when evaluating a claimant's credibility. *See Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000) ("[t]he ALJ . . . did not purport to deny plaintiff benefits on the ground he failed to follow prescribed treatment. Rather, the ALJ properly considered what attempts plaintiff made to relieve his pain – including whether he took pain medication – in an effort to evaluate

11

the veracity of plaintiff's contention that his pain was so severe as to be disabling")

(citations omitted); *see also Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996)

(upholding credibility finding because "[t]he failure to follow prescribed treatment is a

legitimate consideration in evaluating the validity of an alleged impairment").  The ALJ's

discussion of plaintiff's failure to take his seizure medication in this context was not

error.

## III.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the decision of the Commissioner that plaintiff was not disabled

is **AFFIRMED.**

DATED March 27, 2015.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge